# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JEREMY P. GALLANT,                                    Case No. 1:19-cv-466
       Plaintiff,                                         Cole, J.
                                                      Litkovitz, M.J.
    vs.

R. ERDOS, *et al*.,                                   **REPORT**
       Defendants.                                       **AND RECOMMENDATION**

     Plaintiff Jeremy Gallant, a former inmate at the Southern Ohio Correctional Facility ("SOCF"), filed this pro se prisoner civil rights action under 42 U.S.C. § 1983 alleging that on July 11, 2017, SOCF officials and corrections officers, defendants Taylor, Frazie, Salyers, Distel, Dyer, Scott, Parish, Rardin, Cooper, Ervin, Setty, Warren, and Cool, used excessive force and conspired against him in violation of his Eighth Amendment rights.  (Doc. 5).[1]  This matter is before the Court on defendants' motion for summary judgment (Doc. 24), plaintiff's response in opposition (Doc. 32), defendant's reply memorandum (Doc. 35), plaintiff's motion for sanctions (Doc. 29), and defendants' response in opposition (Doc. 31).

## A.  Summary judgment standard

     A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of

---

[1] Plaintiff's remaining claims were dismissed on sua sponte screening of the complaint under 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).  (Doc. 6).

material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Id.*; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[f]acts that are not blatantly contradicted by [the evidence] remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011). "In response to a properly supported summary judgment motion, the non-moving party 'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Maston v. Montgomery Cty. Jail Med. Staff Pers.*, 832 F. Supp. 2d 846, 849 (S.D. Ohio 2011) (quoting *Sixty Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).

A fact is "material" if its resolution will affect the outcome of the lawsuit. *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *5 (N.D. Ohio Dec. 30, 2016), *aff'd,* No. 17-3088, 2017 WL 3726755 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 248). The party who seeks summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 322. To make its determination, the court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

Because plaintiff is a pro se litigant, his filings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005); *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) (pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings). However, a party's status as a pro se litigant does not alter the party's duty on a summary judgment motion to support his factual assertions with admissible evidence. *Maston*, 832 F. Supp. 2d at 851-52 (citing *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010)).

**B. Facts**

In support of the motion for summary judgment, defendants have submitted two video recordings that capture the entire use of force incident. (Video Recordings #1, #2).[2] This

---

[2] The Court notes that the only affidavits or sworn declarations submitted by either party are plaintiff's verified complaint (Doc. 5) and the affidavits authenticating the video recordings, medical records, and the use of force investigation report. (Doc. 24, Exhs. 1, 3, 5). The statements by plaintiff, defendants, and other employees that are reflected in the use of force investigation report, which have been offered as evidence on summary judgment, are not

lawsuit arises out of an incident that occurred at SOCF on July 11, 2017. Defendants' evidence

shows that on that date, at approximately 2:45 p.m., plaintiff positioned himself on top of a

basketball backboard in an outdoor recreation cage. (Doc. 24 at PAGEID 2). Plaintiff tied a torn

bedsheet around his neck with the other end attached to the cage. Defendants Salyers and Frazie

are seen talking with plaintiff. While on top of the basketball backboard, plaintiff said, "I can't

do this no more, . . . I need a new start." (Video Recording #1 at 0:00:59-0:01:10). Plaintiff

requests a prison transfer and says that he is "not coming down" (*Id*. at 0:01:10-0:01:22) and

"You guys are gonna have to beg me to get down here or come in here and cut me down." (*Id*. at

0:03:31-0:03:34).

Plaintiff said, "I'm just a fucking guy doing life in the can" and "I'm just the only guy . . .

that has any type of substance to stand against you guys." (*Id*. at 0:03:57-0:04:10). Recounting

his struggles at SOCF, plaintiff said, "I'd rather die than continue on[.]" (*Id*. at 0:04:34-0:04:39).

Plaintiff described himself as a "homicidal, suicidal inmate" (*Id*. at 0:04:46-0:04:50) and said,

"I'm losing my fucking mind." (*Id*. at 0:05:36-0:05:38). Plaintiff said that he will "sit here all

god damn night" until he gets "a permanent solution" (*Id*. at 0:06:58-0:07:04) and "I'd rather die

out here than in that fucking cage." (*Id*. at 0:08:16-0:08:19). At this point, plaintiff climbed over

the backboard and stood on top of the basketball rim with both feet. (*Id*. at 0:09:56). Plaintiff

said, "I hate my existence that I'm willing to take my own life to end it. I can't do it anymore."

(*Id*. at 0:12:50-0:12:59).

Defendant Frazie told plaintiff that he would take him to the administration, but plaintiff

refused, saying, "Why would I come down, . . . that's not a solution." (*Id*. at 0:13:48-0:14:02).

Plaintiff climbed over the backboard and told defendant Frazie that he should "save [his] energy

---

sworn statements. The Court therefore has not considered these statements in determining whether there is a
genuine factual dispute in this case.

because it's going to be a long night[.]" (*Id*. at 0:14:50-0:14:55). Plaintiff said, "I can't take it no more, . . . come rush in here, take me down or whatever the fuck you gotta do man." (*Id*. at 0:18:38-0:18:50). From 0:19:22-0:24:14, corrections officers approach plaintiff from the outside of the recreation cage and talk to plaintiff. Plaintiff positions himself so that his back is to the camera with both feet still on the basketball rim and his hands grabbing the cage. (*Id*. at 0:22:44-0:24:14).[3]

Video Recording #2 begins with defendant Dyer introducing himself and the special response team ("SRT"), consisting of defendant corrections officers Scott, Parish, Rardin, Cooper, and Ervin. Defendant Distel is introduced as the camera operator. (Video Recording #2 at 0:00:00-0:01:07).[4] Defendant Dyer tells the camera that plaintiff climbed to the top of the recreation cages, tied a noose around his neck, and is threatening to jump. (*Id*. at 0:00:10-0:00:21). Defendant Dyer further tells the camera that the SRT is going to enter the recreation area and give plaintiff orders to come down. OC (a chemical agent) is going to be deployed, and if plaintiff does not comply, then the pepper ball launcher will be deployed. (*Id*. at 0:00:26-0:00:41).

Defendant Dyer and the SRT enter the recreation cage. The video recording shows plaintiff with a rope tied around his neck standing behind the basketball backboard on top of the recreation cage. (*Id*. at 0:05:36). Defendant Dyer orders plaintiff to take the noose off his neck and tells plaintiff four separate times to comply with his orders. (*Id*. at 0:05:35-0:05:50). Plaintiff puts his clothing over his head and tells defendant Dyer that he will jump if he shoots. (*Id*. at 0:05:41-0:05:44). Defendant Dyer again orders plaintiff to take the noose off his neck and

---

[3] Video Recording #1 concludes at 0:24:14.
[4] Each member of the SRT is wearing a helmet with a number: Parish is number 4, Scott is number 2, Rardin is number 5, Cooper is number 3, and Ervin is number 6. (Video Recording #2 at 0:00:53-0:01:06).

to comply with his orders.  (*Id.* at 0:05:55-0:05:58).  Unidentified speakers also tell plaintiff to get down.  (*Id.* at 0:06:05-0:06:08).  Defendant Dyer tells plaintiff that force will be used to gain his compliance.  (*Id.* at 0:06:07-0:06:10).

Defendant Dyer shoots seven pepper ball shots at plaintiff and orders him to take the noose off his neck and come down.  (*Id.* at 0:06:11-0:06:20).  Plaintiff crouches behind the backboard.  Defendant Dyer fires two additional pepper ball shots at plaintiff and repeatedly orders plaintiff to take the noose off his neck.  Plaintiff tells defendant Dyer that he cannot see. At this point, the SRT places a ladder next to plaintiff.  Defendant Parish climbs the ladder and cuts the rope that is attached to the cage.  As defendant Parish is cutting the rope, plaintiff drops from his position behind the backboard and is seen hanging.  The SRT attempts to hold plaintiff up.  After defendant Parish cuts the rope, plaintiff falls to the ground.  (*Id.* at 0:06:20-0:07:06).

The SRT crowds on top of plaintiff while yelling, "give me your hand."  Plaintiff screams.  Defendants repeatedly command plaintiff to "stop resisting [and] give your hands up." Defendants attempt to restrain plaintiff for roughly two minutes.  (*Id.* at 0:07:06-0:08:44).  After plaintiff is restrained, defendants fasten plaintiff to a gurney and immediately transport him to the infirmary where he is evaluated.  (*Id.* at 0:08:38-0:21:23).  Plaintiff was sent to the hospital by ambulance for further evaluation.  (Doc. 24 at PAGEID 229).

Plaintiff was initially evaluated by medical staff at SOCF.  (*Id.*, Exh. 2 at PAGEID 509). Medical staff observed moderate swelling to the right side of plaintiff's face, dislocation and swelling to plaintiff's right ear, an abrasion and moderate amount of swelling to plaintiff's left forehead, redness to plaintiff's upper left cheek, ligature marks on plaintiff's neck, and reddened areas on plaintiff's chest and knees.  (*Id.*).  Plaintiff was subsequently taken by ambulance to the Ohio State University ("OSU") hospital for further evaluation.  (*Id.*).

6

Plaintiff's CT scan of his pelvis, chest, head and neck were unremarkable and revealed no acute findings.  (*Id*. at PAGEID 515-524, 533-534, 541-542).  The medical records revealed soft tissue swelling at the left frontal and right frontotemporal scalp.  (*Id*.)  No other acute abnormalities or traumatic findings, intracranial hemorrhaging, traumatic vascular injury, or acute fractures were detected.  (*Id*.)  Plaintiff was released from OSU to Franklin Medical Center on July 14, 2017 for continued observation.  (*Id*. at PAGEID 539).  Bruising and lacerations were observed on plaintiff's face, but plaintiff did not allow staff to complete an initial assessment or take his vitals.  (*Id*.; *see also Id*. at PAGEID 546-553, 557).  On July 17, 2017, staff was able to take plaintiff's vitals and complete an assessment.  (*Id*. at PAGEID 565).  On that same day, plaintiff was released back to SOCF.  (*Id*. at PAGEID 567).

Plaintiff relies on the allegations in his verified complaint[5] in opposition of defendants' motion for summary judgment.  Plaintiff alleges that on July 11, 2017, he was suffering from a mental health crisis accompanied by suicidal thoughts and intentions.  (Doc. 5 at PAGEID 101).  Plaintiff alleges that defendant Taylor disregarded his mental health crisis.  (*Id*.).  Plaintiff went to the outside recreation area "with [two] homemade ropes/noose" in his possession.  (*Id*.).  Plaintiff alleges defendant Taylor placed plaintiff in the recreation cage with seven other prisoners and left plaintiff "unattended."  (*Id*. at PAGEID 102).  Plaintiff alleges that he climbed to the top of the basketball backboard and fastened the ropes to the cage and then around his neck.  (*Id*.).  Plaintiff alleges that defendant Frazie arrived but made only "half hearted attempts

---

[5] Plaintiff's verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment under Fed. R. Civ. P. 56(e).  *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).

in negotiations." (*Id.*). Plaintiff similarly alleges that defendant Salyers "refused to engage in any genuine mediations." (*Id.*).

Plaintiff alleges that defendant Dyer subsequently arrived with the SRT. (*Id.*). Plaintiff alleges that defendant Dyer made "several threats." (*Id.*). Plaintiff alleges that he tried to surrender a second time, but defendant Dyer told him "it was too late." (*Id.*). Plaintiff alleges that he again tried to surrender, but defendant Dyer "openly threatened" plaintiff "with lethal force." (*Id.* at PAGEID 103). Plaintiff alleges that defendant Dyer ignored his attempts to "peacefully surrender, opting to sadistically employ unlawful lethal force[.]" (*Id.*). Plaintiff alleges that he put his hands up to show that he was surrendering but defendant Dyer shot him five to six times. (*Id.*). Plaintiff alleges that defendant Dyer shot him two to three more times causing him to "slip, fall, and hang." (*Id.*). Plaintiff alleges that "all of the officers involved conspired together to revise this incident" and the "recordings will verify" his account of the incident. (*Id.*).

Plaintiff alleges that after the SRT was "clawing at [his] suspended body," they "body slam[med] [his] life less body down hard upon the concrete floor." (*Id.* at PAGEID 104). Plaintiff alleges that he never resisted. (*Id.*). Plaintiff alleges that the SRT "immediately unleashed a brutal barrage of punches, hits, [and] kicks" as he was lying on the ground. (*Id.*). Plaintiff alleges that one member of the team grabbed his genitals so hard that he defecated himself. (*Id.*). Plaintiff further alleges that the assault was so severe that he had to be "life flighted to O.S.U." (*Id.*). Plaintiff alleges that an "unknown official" said, "Clean him up and make it look like a[n] accident." (*Id.* at PAGEID 105). Plaintiff alleges that his face "was plastered with cuts and bruises" and his "right ear canal was caved in swollen shut." (*Id.*).

### C.  The Eighth Amendment

Plaintiff's Eighth Amendment claims are brought under 42 U.S.C. § 1983, which prohibits any person "under color of any statute, ordinance, regulation, custom, or usage, of any State" from depriving a United States citizen "of any rights, privileges or immunities secured by the constitution and laws."  To prevail on a § 1983 claim, a plaintiff must demonstrate "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."  *Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

A convicted prisoner's right to be free from the use of excessive force by a prison official is governed by the Eighth Amendment.  *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  An Eighth Amendment claim has both a subjective and an objective component.  *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (citing *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013)).  The "core judicial inquiry" on the subjective component is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).  Excessive force claims must focus "on the nature of the force rather than the extent of the injury. . . ."  *Id.* In making this inquiry, the Court must consider the need for the use of force; the relationship between that need and the type and amount of the force used; the threat reasonably perceived by the responsible official; and the extent of the injury inflicted.  *See Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 320-321.  "While the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred."  *Cordell*, 759 F.3d at 580-81 (citing *Wilkins*, 559 U.S. at 37).  "When prison officials maliciously and sadistically use force to cause harm . . .

contemporary standards of decency always are violated . . . whether or not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."  *Wilkins,* 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 9).  The absence of a serious injury is nonetheless relevant as a factor that suggests whether the use of force may "plausibly have been thought necessary" in a given situation.  *Id*. (quoting *Hudson,* 503 U.S. at 7).  Corrections officers do not violate a prisoner's Eighth Amendment rights when they use force "in a good-faith effort to maintain or restore discipline."  *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (quoting *Jennings v. Mitchell,* 93 F. App'x 723, 725 (6th Cir. 2004)).

The objective component requires the "pain inflicted to be 'sufficiently serious.'" *Cordell*, 759 F.3d at 580 (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)). Analysis of this element of an Eighth Amendment claim "requires a contextual investigation, one that is responsive to contemporary standards of decency."  *Id.* (citations and internal quotations omitted).

### D.  Plaintiff's Eighth Amendment claims

#### 1.  Excessive Use of Force

##### a.  Defendants Dyer, Scott, Parish, Rardin, Cooper, and Ervin

Plaintiff alleges that defendants Dyer, Scott, Parish, Rardin, Cooper, and Ervin violated his Eighth amendment rights by using excessive force.  Plaintiff alleges that defendant Dyer committed an "unlawful assault" by shooting a "mentally ill prisoner" numerous times with a pepper ball gun and the SRT committed an "unlawful assault" when he was cut down from hanging.  (*Id*. at PAGEID 86-87).  Plaintiff has failed to establish a genuine issue of fact as to whether defendants used excessive force during the July 11, 2017 incident.

10

**(1) Defendant Dyer**

Defendant Dyer arrived at the recreation cage with the SRT officers only after the previous negotiations with plaintiff had failed.  Prior to Dyer's arrival, plaintiff had climbed the recreation cage and positioned himself on top of the basketball backboard with one end of a torn bedsheet tied around his neck and the other end tied to the fencing of the recreation cage.  He repeatedly demanded a prison transfer and stated that he was not coming down.  Plaintiff specifically stated, "You guys are gonna have to beg me to get down here or come in here and cut me down" (Video Recording #1 at 0:03:31-0:03:34) and said he would "rather die than continue on."  (*Id.* at 0:04:34-0:04:39).  While on top of the backboard with the noose tied around his neck, plaintiff described himself as a "homicidal, suicidal inmate" (*Id*. at 0:04:46-0:04:50) and said that he was "losing [his] fucking mind."  (*Id*. at 0:05:36-0:05:38).  Plaintiff also said that he would "sit here all god damn night" until he gets "a permanent solution" (*Id*. at 0:06:58-0:07:04), "I hate my existence that I'm willing to take my own life to end it.  I can't do it anymore" (*Id.* at 0:12:50-0:12:59), and "I can't take it no more, . . . come rush in here, take me down or whatever the fuck you gotta do man."  (*Id*. at 0:18:38-0:18:50).  There is no dispute that defendant Dyer and the SRT officers were faced with a suicidal inmate who had placed himself in immediate danger of serious physical injury or death.

Plaintiff contends in his verified complaint that upon Dyer's arrival he tried to surrender, but defendant Dyer nevertheless "sadistically employ[ed] unlawful lethal force."  (Doc. 5 at PAGEID 103).  Plaintiff's conclusory assertion is clearly refuted by the video evidence such that no reasonable jury could believe it.  *Scott*, 550 U.S. at 380.

The video shows that defendant Dyer explained on camera before the incident that it might be necessary to use the pepper ball gun to obtain plaintiff's compliance.  (*See* Video

Recording #2). It was only after plaintiff refused numerous direct orders that defendant Dyer used the pepper ball gun to gain plaintiff's compliance. Defendant Dyer ordered plaintiff five separate times to comply with his orders to come down and take the noose off his neck. Unidentified individuals can also be heard on the video ordering plaintiff to get down. Before defendant Dyer shot plaintiff with the pepper ball gun, defendant Dyer *again* told plaintiff that force would be used to gain his compliance if he did not comply with Dyer's orders. The video evidence shows that plaintiff continued to disregard these direct orders. Defendant Dyer's deployment of the seven pepper ball shots was used as a last resort and in response to plaintiff's continued and repeated disobedience of Dyer's direct orders. Plaintiff has not introduced any evidence that refutes the facts documented by the video recording that would call into question defendant Dyer's motives for deploying the pepper ball gun. The undisputed video evidence shows that the force used by Dyer was reasonably "applied in a good faith effort to maintain or restore disciple" and not to "maliciously or sadistically cause harm." *Whitley*, 475 U.S. at 319. *See Williams v. Bowman*, 981 F.2d 901, 905 (6th Cir. 1992) (holding, "in the prison context, good faith use of physical force may be necessary to maintain prison security and discipline[.]"). Plaintiff has failed to submit evidence creating a genuine issue of fact as to whether the force used by defendant Dyer was reasonable under the circumstances. Defendant Dyer is therefore entitled to summary judgment on plaintiff's Eighth Amendment claim premised on the firing of the pepper ball gun.

### (2) Defendants Scott, Parish, Rardin, Cooper, and Ervin

Plaintiff claims that after defendant Dyer deployed the pepper balls, defendants Scott, Parish, Rardin, Cooper, and Ervin "claw[ed] at [his] suspended body" and "body slam[med] [his] lifeless body down hard upon the concrete floor." (Doc. 5 at PAGEID 104). Plaintiff's

conclusory assertions are insufficient to establish a genuine issue of fact requiring resolution at trial. *Scott*, 550 U.S. at 380. The video evidence blatantly contradicts plaintiff's assertions and shows that the SRT officers attempted to hold up plaintiff's body as the bedsheet around his neck was being cut by defendant Parish. The video evidence clearly negates plaintiff's claim that defendants "body slam[med]" plaintiff; rather, the video plainly shows defendants tried to hold him up so that he would not hit the ground. Plaintiff also alleges that one of the defendants grabbed his genitals so hard that he defecated himself. But this allegation, without more, does not establish that plaintiff's Eighth Amendment rights were violated. *See Tuttle v. Carroll Cnty. Detention Ctr.*, 500 F. App'x 480, 482 (6th Cir. 2012) (The allegation that deputy grabbed inmate's privates and squeezed them "really hard" during a search insufficient to state an Eighth Amendment claim).

Plaintiff also claims that defendants Scott, Parish, Rardin, Cooper, and Ervin "unleash[ed] a brutal barrage of punches, hits, and kicks" once he was taken to the ground. (Doc. 5 at PAGEID 104). This conclusory assertion is likewise insufficient to create a genuine issue of fact because it is clearly refuted by the video evidence. *Scott*, 550 U.S. at 380. The video recordings of the incident demonstrate that at no time did any defendant punch, hit, or kick plaintiff. Rather, defendants were attempting to secure plaintiff's hands and legs as he continued to struggle and disobey direct orders to stop resisting and give up his hands. The evidence shows that the force used by defendants was to bring plaintiff under control, stop him from committing suicide, and secure him for transport to the infirmary. Defendants were responding to a serious, life-threatening, situation, and they used force proportional to the severity of the threat.

Other courts facing similar circumstances have determined that the use of chemical agents and physical force to subdue a noncompliant prisoner does not rise to the level of an

Eighth Amendment violation.  For example, in *Brown v. Perez*, No. 16-2558, 2017 WL 3378994 (6th Cir. Apr. 17, 2017), an inmate filed a § 1983 action against corrections officers claiming excessive force in violation of the Eighth Amendment.  The defendants ordered the plaintiff out of his cell after they received a kite that the plaintiff wanted to harm himself.  *Id*. at *1.  The plaintiff refused to comply with the orders because the plaintiff claimed he did not write the kite. *Id*.  The defendants told the plaintiff that they would "gas" him if he did not come out of his cell. *Id*.  The plaintiff refused to comply despite the defendants' warnings.  *Id*.  A team of six corrections officers came into the plaintiff's cell and sprayed him with tear gas.  On these facts, the Sixth Circuit held that the defendants' conduct was reasonably necessary to subdue a noncompliant prisoner.  *Id*. at *3.

The Court of Appeals held that "the use of tear gas in a closed cell, in light of [the plaintiff's] refusals to comply, the officers' efforts to temper the situation and warn of the impending use of tear gas, and the temporary nature of [the plaintiff's] injuries, does not violate the Eighth Amendment."  *Id*.  The Sixth Circuit placed great weight on the plaintiff's refusal to come out of his cell "despite repeated requests by prison officials to do so."  *Id*.  The Court of Appeals reasoned that the defendants' conduct was in response to the plaintiff's noncompliance with the defendants' orders, and "[i]n this context, the defendants did not act maliciously or sadistically by using a chemical agent or restraints to secure [the plaintiff's] compliance after he had repeatedly refused a direct order."  *Id*.

Likewise, in *Davis v. Agosto*, 89 F. App'x 523 (6th Cir. 2004), the Sixth Circuit addressed the use of force against an inmate who repeatedly defied the direct orders of correctional officers.  The defendant correctional officers in *Davis* approached the plaintiff's cell and ordered him to place his hands next to the tray slot so that he could be handcuffed.  The

14

plaintiff "instead refused to comply and remained recalcitrant." *Id*. at 526. The Sixth Circuit held that "under these circumstances, the officers did not act maliciously or sadistically in using mace to secure [the plaintiff's] compliance and to restore order[.]" *Id*. After the defendants used mace, they attempted to bring the plaintiff under control once they entered his cell. *Id*. The defendants entered the plaintiff's cell after they twice attempted to convince the plaintiff to submit to handcuffs. *Id*. The plaintiff "forced his way out of the cell, evaded the taser shield, and started down the prison hallway." *Id*. The defendants tackled the plaintiff, used batons, and placed a taser shield against the plaintiff's back because the plaintiff continued to resist and attempted to strike the defendants. *Id*. In granting the defendants' motion for summary judgment, the Sixth Circuit held, "In view of the officers' prior unsuccessful efforts to convince [the plaintiff] to submit to them, in view of [the plaintiff's] decision to force himself out of the cell and in view of [the plaintiff's] continued resistance even after being tackled, these appropriately-incremental increases in the use of force by the officers did not as a matter of law violate his Eighth Amendment rights." *Id*.

Similarly, in *Manley v. Hughes*, No. 4:18-cv-1431, 2019 WL 7900071 (N.D. Ohio Oct. 31, 2019), *report and recommendation adopted as modified*, No. 18-cv-1431, 2019 WL 7343250 (N.D. Ohio Dec. 31, 2019), an inmate filed a § 1983 action against corrections officers claiming excessive force in violation of the Eighth Amendment. The plaintiff in *Manley* told a corrections officer that he had razors in his cell, and the corrections officer ordered the plaintiff to cuff up. The defendants deployed OC spray into the plaintiff's cell after the plaintiff did not comply with this order. *Id*. at *4. The plaintiff "continued to disobey [the defendants'] orders and took steps to slow the effects of the OC spray on him by covering his face with a towel or clothing." *Id*. The defendants next shot pepper balls into the plaintiff's cell, "yet [the plaintiff] still did not

15

comply with orders to cuff up." *Id*. The officers then entered the plaintiff's cell to extract him, and the plaintiff fought them. *Id*. The court held that under these circumstances, "[t]he use of OC spray, pepper balls, a stinger grenade, and the officers' extraction of him from his cell were all used in a good-faith effort to maintain or restore discipline when [the plaintiff] disobeyed orders to cuff up after he told officers that he had razors in his cell; it was not done to maliciously and sadistically cause harm." *Id*. at *5. *Compare Williams v. Curtin*, 631 F.3d 380, 384 (6th Cir. 2011) (plaintiff stated a valid excessive force claim when he "allege[d] that, when instructed to 'pack up,' he inquired, 'What for, sir?,' at which point an 'assault team' entered the cell and used a chemical agent on him."); *Roberson v. Torres*, 770 F.3d 398, 406-07 (6th Cir. 2014) (denying qualified immunity at the summary judgment stage to defendants who allegedly sprayed an inmate with a chemical agent while he was sleeping).

Similar to the plaintiffs in *Brown*, *Davis*, and *Manley*, plaintiff here repeatedly refused to comply with defendants' direct orders thereby necessitating the use of force to gain plaintiff's compliance. Defendant Dyer repeatedly ordered plaintiff to come down from the basketball backboard and take the noose off his neck before he deployed the pepper ball gun. Likewise, defendants Scott, Parish, Rardin, Cooper, and Ervin employed a good faith use of force to cut the noose off plaintiff's neck, lower him to the ground, and restrain him for transport to the infirmary. There is no genuine dispute of fact that defendants' use of force was reasonable under the circumstances. Therefore, the motion for summary judgment should be granted on plaintiff's excessive use of force claims against defendants Dyer, Scott, Parish, Rardin, Cooper, and Ervin.

### b. Defendant Distel

Plaintiff claims that defendant Distel violated his Eighth Amendment rights when he "ordered and authorized" the use of force and dispatched the SRT to the recreation cage on July

16

11, 2017.  (Doc. 5 at PAGEID 85, 102, 107).  The Court concludes that summary judgment should be granted for defendant Distel because even if he authorized the use of force by the SRT, plaintiff has failed to establish his underlying excessive use of force claim against the SRT defendants.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the [municipality] might have authorized [unconstitutional conduct] is quite beside the point.").  *See also Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 545 (6th Cir. 2003) (in the absence of a constitutional violation of inmate's Eighth Amendment right by individual defendants, private company that managed prison cannot be held liable).

### 2.  Conspiracy

#### a.  Defendants Dyer, Scott, Parish, Rardin, Cooper, Ervin, and Setty

Plaintiff also claims that defendants Dyer, Scott, Parish, Rardin, Cooper, Ervin, and Setty conspired to use excessive force against him.  "A claim for civil conspiracy under § 1983 exists only where the plaintiff has established a separate and actionable constitutional injury." *Rapp v. Dutcher*, 557 F. App'x 444, 450 (6th Cir. 2014).  Summary judgment should be granted for these defendants on plaintiff's conspiracy claim because plaintiff has not established an underlying Eighth Amendment excessive use of force claim against defendants.  *See Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 462-63 (6th Cir. 2011); *see also Wiley v. Oberlin Police Dep't.*, 330 F. App'x 524, 530 (6th Cir. 2009) (holding that the plaintiff could not "succeed on a conspiracy claim because there was no underlying constitutional violation that injured her").

#### b.  Defendants Warren and Cool

Plaintiff alleges that sometime after the July 11, 2017 incident, defendants Warren and Cool confided in plaintiff that "they personally instructed the 5 man [SRT] team to rough me up"

and this was "their way of getting even."  (Doc. 5 at PAGEID 104).  To the extent plaintiff is alleging a conspiracy claim against defendants Warren and Cool based on the incident that occurred on July 11, 2017, plaintiff's claim fails because plaintiff has not established an underlying Eighth Amendment violation.  Summary judgment should be granted to defendants Warren and Cool on plaintiff's conspiracy claim.

### 3. Deliberate Indifference

#### a. Defendant Taylor

Plaintiff alleges that defendant Taylor's inappropriate supervision and deliberate indifference directly caused the events leading up to the July 11, 2017 assault in the recreation cage.  (Doc. 5 at PAGEID 87).  Plaintiff asserts that defendant Taylor was deliberately indifferent to his health and safety because he "completely disregarded" plaintiff's "current crisis" and, instead, permitted plaintiff to attend outside recreation with ropes and a noose in his possession.  (*Id*. at PAGEID 101).

The Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  A prison official violates the Eighth Amendment "when, among other things, [he] acts with 'deliberate indifference to serious medical needs of prisoners.'" *Broughton v. Premier Health Serv., Inc*., 656 F. App'x 54, 56 (6th Cir. 2016) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  A plaintiff must present evidence showing that the defendant's conduct amounted to "deliberate indifference" to a known risk of harm.  *Farmer*, 511 U.S. at 837.  *See also Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997).  Deliberate indifference includes both objective and subjective elements.  *Farmer*, 511 U.S. at 834; *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011); *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001).  The objective component "requires

18

proof of a 'sufficiently serious' medical need." *Broughton*, 656 F. App'x at 56 (citing *Farmer*, 511 U.S. at 834). The subjective element focuses on whether the defendant knows that the plaintiff faced a substantial risk of harm and "disregard[ ] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

The Court finds that summary judgment should be granted to defendant Taylor because no genuine dispute exists as to whether defendant Taylor was deliberately indifferent to a *known* risk of harm to plaintiff. Plaintiff has not produced evidence showing that defendant Taylor acted with deliberate indifference or had knowledge of a sufficiently serious risk of harm to plaintiff. Plaintiff makes no allegations that defendant Taylor knew, was aware, or had any knowledge of plaintiff's suicidal thoughts or ideations.

Plaintiff alleges that on July 11, 2017, he suffered a mental health crisis with suicidal thoughts and ideations. (Doc. 5 at PAGEID 101). Plaintiff alleges he "verbally expressed [his] suicidal thoughts *to staff*, all to no avail." (*Id.*) (emphasis added). But plaintiff does not allege that he expressed his suicidal thoughts specifically to defendant Taylor. Instead, plaintiff alleges that he advised defendant Taylor only "of his current crisis." (*Id.*). Assuming, arguendo, that plaintiff establishes the objective component of his deliberate indifference claim, he nevertheless fails to establish the subjective component of the claim.

Advising defendant Taylor of his "current crisis" fails to give defendant Taylor specific knowledge that plaintiff's mental health posed a substantial risk of harm and was sufficiently serious. *See Farmer*, 511 U.S. at 837 ("The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). Plaintiff's conclusory allegation that he was having a crisis did not put defendant Taylor on notice that there was a "strong likelihood" that plaintiff would attempt suicide. *See*

*Downard for Est. of Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020).  "[I]t is not enough to establish that an official may have acted with deliberate indifference to some *possibility* of suicide, or even a *likelihood* of suicide; the test is a *strong likelihood* of suicide."  *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013) (emphasis in the original).  Plaintiff has failed to present evidence showing that a reasonable jury could conclude that defendant Taylor perceived a strong likelihood of suicide based solely on plaintiff's allegation that he advised defendant Taylor "of his current crisis."

Additionally, plaintiff fails to present any evidence that defendant Taylor knew plaintiff had torn bed sheets in his possession from which to fashion a noose before he went to the recreation cage.  Thus, the evidence does not support a finding that defendant Taylor knew plaintiff faced a "substantial risk of harm" of suicide and "disregard[ed] that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  Moreover, once defendant Taylor was informed by other inmates that plaintiff needed to "see mental health" and observed plaintiff at the top of the basketball backboard with a noose around his neck, defendant Taylor reported a "signal 30," to which staff, including defendant Frazie, responded.  (Doc. 24 at PAGEID 282).  Defendant Taylor's actions in this regard do not show deliberate indifference to plaintiff's safety and mental health needs.[6]  Accordingly, plaintiff has not satisfied the subjective component of his Eighth Amendment claim against defendant Taylor.

---

[6] The Court considers the investigator's findings encompassed in the Investigation Summary Report Use of Force as to the sequence of events leading up to arrival of defendant Frazie.  *See Combs v. Wilkinson*, 315 F.3d 548, 555-56 (6th Cir. 2002) (holding Use of Force Committee Report admissible under Fed. R. Evid. 803(8)).

### b. Defendants Salyers and Frazie

Plaintiff claims that defendants Salyers and Frazie violated his Eighth Amendment rights by engaging in "half-hearted and unethical negotiations" and by "failing to dispatch any mental health professionals, nor take actions." (Doc. 5 at PAGEID 85, 87, 102).

The video recordings of the incident directly refute plaintiff's allegations that defendant Salyers, the SOCF mental health administrator, ignored plaintiff's "pleas for help." (*Id*. at PAGEID 109). Plaintiff states that defendant Salyers "threaten[ed] [plaintiff] with physical injuries by security [and] made no attempts to intervene on [his] behalf." (*Id*.). Although plaintiff faced a substantial risk of harm because he was on top of a basketball backboard with a bed sheet tied around his neck, plaintiff nevertheless fails to present any evidence creating an issue of fact that defendant Salyers "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. The video evidence shows that defendant Salyers attempted to address plaintiff's mental health concerns by (a) offering medication to plaintiff which he refused, and (b) engaging plaintiff in conversation and pointing out the consequences of his threatened actions, such as never seeing his children again. Plaintiff repeatedly told defendant Salyers that he needed a new start and was requesting a prison transfer. For over two minutes, defendant Salyers continued to converse with plaintiff in an attempt to diffuse the situation, but plaintiff insisted that he was "not coming down without the regional director's okay." (Video Recording #1 at 0:00:26-0:02:34). The videotape evidence unequivocally shows that defendant Salyers was not deliberately indifferent to plaintiff's safety or failed to take reasonable measures to address the risk of harm to plaintiff.

Similarly, plaintiff fails to establish an Eighth Amendment violation against defendant Frazie. Plaintiff appears to base his Eighth Amendment deliberate indifference claim on

defendant Frazie's conduct in making "half hearted attempts in negotiations."  (Doc. 5 at PAGEID 102).  Plaintiff also states that defendant Frazie "unethically distracted [him] while the malicious plan of attack was being devilously (sic) conceived."  (*Id*. at PAGEID 108).  Plaintiff's conclusory assertions are blatantly contradicted by the video evidence such that no reasonable jury could believe them.  *Scott*, 550 U.S. at 380.

The video evidence shows that defendant Frazie spoke with plaintiff for roughly seventeen minutes while plaintiff was sitting on top of the basketball backboard with a noose tied around his neck.  (Video Recording #1 at 0:02:30-0:19:00).  Plaintiff repeatedly demanded a solution to the problems he was experiencing at SOCF.  Plaintiff asked defendant Frazie to call the regional director and tell him that he has a "homicidal, suicidal inmate on his hands who needs a solution to his problem."  Defendant Frazie told plaintiff two separate times that he would walk with plaintiff down to the administration (*Id*. at 0:11:50-0:12:05; 0:13:48-0:14-14), but plaintiff refused these offers.  Plaintiff finally told defendant Frazie, "I can't take it no more, . . . come rush in here, take me down or whatever the fuck you gotta do man."  (*Id*. at 0:18:38-0:18:50).

The video evidence establishes that defendant Frazie did not subjectively "disregard" any risk of harm to plaintiff.  Rather, he took reasonable measures to address any potential harm, including speaking with plaintiff for over seventeen minutes and offering to take plaintiff to the administration.  Plaintiff has failed to identify any record evidence that creates a genuine issue of fact on his Eighth Amendment claim against defendant Frazie.  Accordingly, summary judgment should be granted to defendants Salyers and Frazie.

**E.  Plaintiff's motion for sanctions (Doc. 29)**

Plaintiff moves the Court for sanctions under Fed. R. Civ. P. 37 arising from defendants' alleged failure to make the video recordings available to plaintiff for review.  (Doc. 29).  Fed. R. Civ. P. 37(b)(2) provides for sanctions where a party fails to comply with a discovery order.  In plaintiff's response in opposition to summary judgment, plaintiff states that he was "provided several opportunities to review the numerous video recordings" and has "inspected all of the available materials that defense has submitted" including the video recordings.  (Doc. 32 at PAGEID 679, 681).  For this reason, plaintiff's motion for sanctions, premised on the basis that the video recordings were unavailable for plaintiff's review, should be DENIED as moot.

**F.  Conclusion**

Plaintiff has not introduced affidavits or other evidence to create a genuine dispute as to any material fact.  The undisputed evidence does not show that defendants violated plaintiff's Eighth Amendment rights.  Defendants are therefore entitled to summary judgment.

**IT IS THEREFORE RECOMMENDED THAT:**

1.  Defendants' motion for summary judgment (Doc. 24) be **GRANTED**.

2.  Plaintiff's motion for sanctions (Doc. 29) be **DENIED** as moot.

3.  The Court certify pursuant to 28 U.S.C. § 1915(a)(3) that for the foregoing reasons an appeal of any Court Order adopting this Report and Recommendation would not be taken in good faith.  *See McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997).

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JEREMY P. GALLANT,                              Case No. 1:19-cv-466
      Plaintiff,                                  Cole, J.
                                        Litkovitz, M.J.
      vs.

R. ERDOS, *et al*.,
      Defendants.

**NOTICE**

      Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

24